OPINION
{¶ 1} Petitioner-appellee, Steven Schottenstein, filed a petition for a domestic violence civil protection order on March 1, 2002, alleging respondent-appellant, Jill D. Schottenstein, engaged in various acts of domestic violence against their minor children, Sarah, born February 8, 1986; Ashley, born June 20, 1987; and Abby, born November 21, 1988, that resulted in the children being abused children as defined in R.C. 2151.031. The petition alleged various acts including permitting truancy, seeking unnecessary medical treatment, and disseminating inappropriate literature which attacked appellee and disclosed information about the children which was harmful and damaging. Appellant also filed a petition for a domestic violence civil protection order alleging that appellee was engaging in various acts of domestic violence against the minor children, including stalking, causing physical injury and intimidating them physically.
 {¶ 2} The parties were divorced in 2001, but the decision has resulted in multiple appeals and the custody issues are currently pending in the trial court. A trial was held on both civil protection order petitions simultaneously and the trial court granted appellee's request for a domestic violence civil protection order and denied appellant's request.[1]
 {¶ 3} The civil protection order provided that appellant was restrained from committing further acts of abuse or threats of abuse, and restrained appellant from having contact with appellee, Sarah, Ashley and Abby. Appellant was further prohibited from entering the residence or school of Sarah, Ashley and Abby, or the business or place of employment of appellee, including the buildings, grounds and parking lots; was ordered to stay 500 yards away from appellee, Sarah, Ashley and Abby; and was prohibited from initiating any contact with them. The order allowed supervised parenting time for appellant with the times and duration to be recommended by the children's mental health professional after meeting the following conditions: 1) appellant participates and undergoes psychological counseling by a psychologist or psychiatrist of her choice; 2) the children's mental health professional deems the children psychologically ready to participate in such parenting time; and 3) supervision shall be at Welcome to Our Place at appellant's cost. The order is to remain in effect until August 1, 2005, unless modified by court order or a final custody order is granted in Case No. 98DR-01-347 and all appeals are exhausted, whichever occurs first. Appellant's motion for stay and a motion for new trial were both denied.
 {¶ 4} Appellant raises the following assignment of error:
Whether The Court Erred To The Substantial Prejudice Of The Respondent-appellant, Jill D. Schottenstein In Granting Petitioner-appellee, Steven Schottenstein Request For A Civil Protection Order.
 {¶ 5} Appellant has raised five issues within this assignment of error, as follows:
[1.] The lower court deprived Sarah Schottenstein of equal protection of law and due process of law when it refused to make Sarah Schottenstein a party to this matter and have counsel appointed.
[2.] The lower court erred in granting an order of civil protection for a period of five (5) years or until all appeals have been decided as said order effectively modified parental rights and responsibilities until the minor children attained the age of majority and beyond.
[3.] The trial court did not have jurisdiction to decide this matter pursuant to R.C. 3113.31(E)(1)(d).
[4.] The trial court erroneously applied R.C. 2919.22 in deciding that the minor children were abused and in the issuance of the Civil Protection [order].
[5.] The lower court erred in granting an order of civil protection to Petitioner-Appellee, Steven Schottenstein as said order was against the manifest weight of the evidence and is an abuse of discretion on the part of the trial court.
 {¶ 6} By the first issue presented in her assignment of error, appellant contends that the trial court deprived Sarah Schottenstein of equal protection of law and due process when it refused to make Sarah a party to this matter and to have counsel appointed on her behalf. During the hearing on this matter, on April 23, 2002, appellant filed a motion to join Sarah as a party and to have an attorney appointed to represent her. The motion was based upon Civ.R. 75(B)(2), as well as the right of Sarah to be joined as a party to a domestic violence matter involving her. The trial court denied the motion because it was filed pursuant to Civ.R. 75(B)(2), which pertains to divorces and dissolutions, not to domestic violence civil protection orders and the statute makes no provision for joining a child as a party in a domestic violence action.
 {¶ 7} The motion to join Sarah as a party was made pursuant to Civ.R. 75(B)(2), which involves the joinder of parties in divorce, annulment and legal separation actions. This action involved petitions for civil protection orders because of alleged domestic violence pursuant to R.C. 3113.31. R.C. 3113.31 does not contain a provision for joining a child as a party to the action because, generally, the party filing the civil protection order petition is attempting to protect the child's interests. Appellant has failed to specify any liberty interest that entitles Sarah to due process nor indicate in what manner Sarah was denied equal protection with others similarly situated. Further, an action brought, pursuant to R.C. 3113.31, is a civil proceeding, West v. West (Dec. 7, 1994), Montgomery App. No. 14600, and there is no constitutional right to appointment of counsel in a civil action. Roth v. Roth (1989), 65 Ohio App.3d 768, 776. Thus, the trial court did not err in failing to join Sarah as a party to the action or in failing to appoint counsel to represent Sarah.
 {¶ 8} Appellant also argues R.C. 3113.31 is unconstitutional. Appellant failed to challenge the constitutionality of R.C. 3113.31 in the trial court. It is well settled that issues not raised in the trial court may not be raised for the first time on appeal because such issues are deemed waived. State v. Burge (1993), 88 Ohio App.3d 91, 93, citing State v. Comen (1990), 50 Ohio St.3d 206, 211. Even a constitutional issue may be waived if it is not properly raised. In re M.D. (1988),38 Ohio St.3d 149. Thus, we decline to address the constitutionality of R.C. 3113.31. The first issue presented by appellant's assignment of error is not well-taken.
 {¶ 9} By the second issue presented by her assignment of error, appellant contends that the trial court erred in granting an order of civil protection for a period of five years, or until all appeals have been decided, as said order effectively modified parental rights and responsibilities until the minor children attained the age of majority and beyond. Initially, it should be noted that the civil protection order, dated August 1, 2002, is effective until August 1, 2005, which is a period of three years, not five. Also, the order provides that the order could expire earlier if modified or dismissed by the court, or a final custody order is granted in the pending custody case and all appeals are exhausted. R.C. 3113.31(E)(3)(a) provides that a civil protection order may be valid up to five years. R.C. 3113.31(E)(3)(b) provides that a civil protection order that temporarily allocates parental rights and responsibilities shall terminate on the date that a court in an action for divorce, dissolution of marriage, or legal separation issues an order allocating parental rights and responsibilities. This order complies with both of these requirements. Thus, the trial court did not abuse its discretion in granting the order. Appellant's second issue presented by her assignment of error is not well-taken.
 {¶ 10} By the third issue presented by her assignment of error, appellant contends that the trial court did not have jurisdiction to decide this matter pursuant to R.C. 3113.31(E)(1)(d). R.C. 3113.31(E)(1)(d) provides, as follows:
(E)(1) After an ex parte or full hearing, the court may grant any protection order, with or without bond, or approve any consent agreement to bring about a cessation of domestic violence against the family or household members. The order or agreement may:
* * *
(d) Temporarily allocate parental rights and responsibilities for the care of, or establish temporary parenting time rights with regard to, minor children, if no other court has determined, or is determining, the allocation of parental rights and responsibilities for the minor children or parenting time rights[.]
 {¶ 11} In support of her argument, appellant relies on Couch v. Harrison (Feb. 12, 2001), Clermont App. No. CA2000-08-063, in which the court found that the purpose of the restriction in R.C. 3113.31(E)(1)(d) is to prevent a party from forum shopping. In Couch, the custody determination and the civil protection order determination were made in the same court and the Twelfth District Court of Appeals found that the trial court had jurisdiction. The court in Couch further found that, while a civil protection order could not permanently allocate parental rights and responsibilities, it may do so on a temporary basis as the trial court did here. Thus, Couch supports the actions of the trial court.
 {¶ 12} Appellant also argues that the use of "court" in R.C.3113.31(E)(1)(d) requires the judge assigned to the divorce and custody action to decide the petition for a domestic violence civil protection order. We disagree. R.C. 3113.31(A)(2) defines "court" to mean "the domestic relations division of the court of common pleas in counties that have a domestic relations division, and the court of common pleas in counties that do not have a domestic relations division." Thus, the use of "court" in R.C. 3113.31 does not refer to a specific judge, but, rather, the domestic relations court as a whole. The petition for a civil protection order was filed as a new action, not part of the divorce action and was properly assigned to a judge by lot in accordance with Loc.R. 25 of the Court of Common Pleas of Franklin County, Division of Domestic Relations. Appellant's third issue presented by her assignment of error is not well-taken.
 {¶ 13} By the fourth issue presented by her assignment of error, appellant contends that the trial court erroneously applied R.C. 2919.22
in deciding that the minor children were abused and in the issuance of the civil protection order. The trial court determined that a grant of a civil protection order under circumstances that are as extreme as those in this case is consistent with the letter and spirit of the civil domestic violence statute. R.C. 3113.31 provides, as follows:
(A) As used in this section:
(1) "Domestic violence" means the occurrence of one or more of the following acts against a family or household member:
* * *
(c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code.
 {¶ 14} R.C. 3113.31(A)(1)(c) specifically directs the court to R.C. 2151.031, which defines an abused child, in part, by incorporating the definition of an endangered child in R.C. 2919.22. R.C. 2151.031
provides:
As used in this chapter, an "abused child" includes any child who:
* * *
(B) Is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abused child;
* * *
(D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare.
(Emphasis added.)
 {¶ 15} Thus, for purposes of R.C. 3113.31, a child may be subjected to domestic violence and entitled to a civil protection order if the child is endangered within the meaning of R.C. 2919.22 or suffers mental injury that harms or threatens to harm the child's health or welfare as the result of the action of the child's parent, guardian or custodian. R.C. 2919.22(A) provides, in part:
(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care * * * or support. * * *
 {¶ 16} R.C. 2151.011(A)(22) defines a "mental injury" as:
* * * [A]ny behavioral, cognitive, emotional, or mental disorder in a child caused by an act or omission that is described in section 2919.22
of the Revised Code and is committed by the parent or other person responsible for the child's care.
 {¶ 17} In this instance, the court found, and the record provides, substantial evidence, discussed in detail below, that appellant caused mental injury to Sarah, Ashley and Abby, as set forth in R.C.2151.011(A)(22) and 2151.031, and created a substantial risk to their health and safety by violating a duty of care, protection or support as prohibited in R.C. 2919.22(A).
 {¶ 18} While appellant argues that a civil protection order requires proof of a physical injury, the definition of an abused child in R.C. 2151.031 includes one who has suffered a mental injury. Likewise, there is no language in R.C. 2919.22(A), on which the trial court relied, that requires the injury to a child to result in a physical injury in order to constitute child endangering. Appellant's fourth issue presented by her assignment of error is not well-taken.
 {¶ 19} By the fifth issue presented by her assignment of error, appellant contends that the trial court erred in granting an order of civil protection to appellee because the order was against the manifest weight of the evidence and is an abuse of discretion on the part of the trial court. Judgments which are supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, syllabus. In order to find that the trial court abused its discretion, we must find more than an error of law or judgment, an abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Most instances of an abuse of discretion result in decisions that are unreasonable as opposed to arbitrary and capricious. AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157. A decision that is unreasonable is one that has no sound reasoning process to support it.
 {¶ 20} R.C. 3113.31(E)(1) provides that, "[a]fter an ex parte or full hearing, the court may grant any protection order, with or without bond, or approve any consent agreement to bring about a cessation of domestic violence against the family or household members."
 {¶ 21} Appellee alleged that appellant had abused the children by permitting truancy, seeking unnecessary medical treatment, and disseminating inappropriate literature which attacked appellee and disclosed information about the children which was harmful and damaging.
 {¶ 22} Most of the testimony focused on seeking unnecessary treatment for the oldest daughter, Sarah. The first witness was Steven Canowitz, M.D., a board-certified specialist in internal medicine and pediatrics. He testified that he initially treated Sarah on February 13, 2001, with some follow-up visits for oral ulcers which were believed to be the result of scuba diving. (Tr. Vol. I, at 52.) Sarah also had some complaints of ear pressure, chest pain, fatigue and some other various illnesses or concerns. He believed stress was causing the symptoms but made no determination as to the cause of the stress. The last time he treated Sarah was July 19, 2001. (Tr. Vol. I, at 55.) In the few weeks before trial, he reviewed Sarah's records, including her records from Columbus Children's Hospital, her dermatologist, two rheumatologists, a physiatrist, the Cleveland Clinic, emergency room visits from both Grant Hospital and Children's Hospital and her visits to Urgent Care. (Tr. Vol. I, at 55-56.) He also reviewed the medications that Sarah had been taking. (Tr. Vol. I, at 57.)
 {¶ 23} Dr. Canowitz testified that he reviewed all of Sarah's medical records involving all the doctors and the medications she had been prescribed. (Tr. Vol. I, at 55-56.) Dr. Canowitz testified that it was significant that there were so many doctors, emergency room visits and urgent-care physicians, but no one physician had an opportunity to understand the whole background of Sarah's medical history. (Tr. Vol. I, at 57.) There was insufficient follow-up care with the physicians because Sarah did not return. (Tr. Vol. I, at 62.) Also, Dr. Canowitz was concerned that Sarah had been taking antibiotics for 103 days in 2001, which he cited as an example of the doctors only receiving a partial story concerning Sarah's medical history. (Tr. Vol. I, at 59.) Dr. Canowitz testified that, in his opinion, based upon the review of the records there is no physical reason for Sarah's symptoms other than stress. (Tr. Vol. I, at 64.) He also stated that there was no physical reason for Sarah to be wheelchair bound. (Tr. Vol. I, at 67-68.) In his opinion, Sarah suffers from a mental injury that threatens her health or welfare and creates a substantial risk to her health, safety and well-being. (Tr. Vol. I, at 68-70.) Dr. Canowitz found that the fragmented care, as a result of the lack of complete information to each doctor, resulted in unnecessary treatment that was abusive to Sarah and a danger to her health and well-being. (Tr. Vol. II, at 102-103.)
 {¶ 24} Sarah's medical history since January 2001 was extensive. In September 2001, Sarah was taken to Suffield Academy in Connecticut; however, once there, Sarah spent an unusual amount of time in the infirmary and she left the school a couple weeks later. Appellee flew her to Cross Creek, in Utah, a facility which includes academics, recreation and discipline for students. Appellee felt that Cross Creek was not an environment which provided enough nurturing for Sarah, but he felt as if he had limited choices of places for Sarah. (Tr. Vol. VI, at 116; 119.) After approximately one week at Cross Creek, Sarah had written a suicide note and appellee took Sarah to the Menninger Clinic in Topeka, Kansas. (Tr. Vol. VI, at 120-121.)
 {¶ 25} Upon her admission, Sarah was diagnosed as having a depressive disorder NOS (not otherwise specified), which the doctors believed was partly due to chronic parental discord and the length of time the custody battle was taking. Sarah was also diagnosed with having an anxiety disorder NOS which related to separation from her mother and a possible over-identification with her mother's anxiety. (O'Malley Depo., at 11.) While at Menninger, Sarah was a good student and her depression was reduced. (O'Malley Depo., at 19.) She was quite healthy physically and her somatic complaints were almost resolved. (O'Malley Depo., at 22.) Appellant constantly pressured the school officials to classify appellee as an abusive parent and continued to suggest that Sarah did not need to be there. (O'Malley Depo., at 27-28.) While at the Menninger Clinic, the relationship between Sarah and her father improved. (O'Malley Depo., at 33.) The staff psychologist testified that Sarah was extremely identified with and dependent upon appellant and protected the relationship with her mother at all costs. The two were "enmeshed." (O'Malley Depo., at 35-37.) After a visit home with appellant for Thanksgiving, Sarah did not return to Menninger and she was discharged against medical advice.
 {¶ 26} After returning to Columbus, Sarah lived with appellant, and appellee testified that he had no visitation with Sarah between December and the trial, which began in April 2002. (Tr. Vol. VI, at 127-128.) When Sarah returned to Columbus, she was enrolled in Bexley High School. The high school principal testified that, between December 14, 2001 and April 4, 2002, Sarah had 20 excused days of absence and 32 unexcused days of absence. (Tr. Vol. IV, at 239.) Appellee, as the custodial parent was being charged with truancy. (Tr. Vol. IV, at 244.) Sarah had only been in school for five days since she enrolled on December 17, 2001.[2] (Tr. Vol. IV, at 247.)
 {¶ 27} On January 24, 2002, Sarah was admitted to Columbus Children's Hospital and discharged on January 28, 2002. The discharge summary provided that Sarah had a temperature of 102 degrees when admitted, she had lip and oral lesions, and also lesions on her eyes and hands. (Appellee's Ex. J.) The hospital suspected several causes, including Stevens-Johnson syndrome, Behcet's disease or erythema multiforme. A rheumatologist, Dr. Gloria Higgins, was asked to see Sarah as a consulting physician. Dr. Higgins determined that no further consultation was necessary because Sarah did not have a rheumatological condition. (Tr. Vol. VIII, at 178.) While hospitalized, Dr. Mark Bechtel, a dermatologist, examined Sarah. A biopsy of her hand was taken and no evidence of herpes was found, but the findings were consistent with erythema multiforme, which is a variant of Stevens-Johnson syndrome, an allergic reaction that affects the skin and mucous membranes. (Bechtel Depo., at 100; 107.) In addition to causing a severe rash, it can also affect the lining of the mouth, eyes and urethra. Erythema multiforme, is often precipitated by recurrent herpes simplex. (Bechtel Depo., at 107-108.) The pathologist determined that the biopsy results were inconsistent with Behcet's disease. (Bechtel Depo., at 100.)
 {¶ 28} Appellant took Sarah to the Cleveland Clinic in early February 2002. She was seen by Dr. Johanna Goldfarb, an infectious disease specialist, who determined that Sarah had Stevens-Johnson syndrome or erythema multiforme, complicating a previous oral herpes simplex infection, but the Stevens-Johnson or erythema multiforme was resolved. Dr. Goldfarb thought that Sarah may have a connective tissue disorder that could only be diagnosed over time, but that the "social issues" were significant. The doctor's notes also provided that Sarah and appellant were enmeshed. (Appellee's Ex. L.)
 {¶ 29} On February 11, 2002, appellant took Sarah to Dr. Ronald Whisler, a rheumatologist, who wrote to Dr. Bechtel. Sarah was complaining of the recurring oral ulcers and severe joint pain. The concern was an underlying connective tissue disease. Dr. Whisler suspected an underlying inflammatory bowel disease. (Appellee's Ex. M.)
 {¶ 30} Dr. Bechtel then referred Sarah to Dr. Thomas Rossi, a physical medicine specialist, who evaluated Sarah on February 18, 2002, regarding complaints of weakness and joint pain. (Bechtel Depo., at 24; 93.) At the time, Sarah was confined to a wheelchair. (Appellee's Ex. Q.) Dr. Rossi did extensive testing, including a nerve conduction test, bone scans and head scans, and could find no physical neurological findings or imaging studies to support any neurological disease. (Bechtel Depo., at 93-94; Appellee's Ex. Q, R, S, and T.)
 {¶ 31} Dr. Bechtel also referred Sarah to Dr. Rodney Kusumi, an infectious disease specialist. Dr. Kusumi admitted he did not identify Sarah's problems but did identify several possible causes for Sarah's symptoms, including Behcet's disease, some immunologic connective tissue disorder or Crohn's disease. Dr. Kusumi recommended a rheumatologist and possibly a gastroenterology evaluation. (Appellee's Ex. V.) Dr. Kusumi did not find a physical basis for any diagnosis. (Bechtel Depo., at 98.)
 {¶ 32} Finally, Dr. Bechtel referred Sarah back to Dr. Canowitz and recommended that Dr. Canowitz coordinate her doctors, tests and findings. Dr. Bechtel felt that it was important to have a primary care physician coordinate and oversee the different aspects of Sarah's medical condition. (Bechtel Depo., at 21.)
 {¶ 33} In March 2002, appellee wrote to appellant informing her that, as the residential parent and custodian, he had arranged for Dr. Canowitz to complete further evaluations of Sarah and to coordinate any further visits with any rheumatologist. Appellee testified that appellant did not follow through with the coordination of care through Dr. Canowitz. (Tr. Vol. VI, at 156; Appellee's Ex. X.)
 {¶ 34} A second doctor, Dr. Ronald Litvak, also testified. He is a psychiatrist who examined both appellee and appellant during the pendency of the divorce in 1999. (Tr. Vol. II, at 150.) He concluded at that time that appellant's conduct was going to involve a lot of anxiety, impulsive, self-centered behavior and be characterized by not being very flexible or open to information that would contradict her own opinions and desires. (Tr. Vol. II, at 154.) After reviewing medical records and records from both Bexley schools and the Menninger Clinic, as well as talking to the principal and assistant principal at Bexley High School, Dr. Litvak opined that the children were abused by appellant. (Tr. Vol. II, at 156-158.) He believed that the children suffer from a mental injury that harms or threatens to harm their health or welfare, and that appellant's actions create a substantial risk to the health and safety of her children. (Tr. Vol. II, at 158-159.) He believed that appellant had done this by verbally accusing her husband of both physical misbehavior and psychological misbehavior with the children, which has not been substantiated. She made such information public which would embarrass the children. According to Dr. Litvak, that type of behavior interferes with the children being able to independently decide whether or not they want to have a relationship with appellee and the opportunity to have a healthy relationship with him. (Tr. Vol. II, at 159-160.) Dr. Litvak opined appellant has also deprived Sarah of the opportunity to further her education, get adequate medical follow-up treatment, and has alienated her from her father. (Tr. Vol. II, at 160.) Dr. Litvak testified that he believed the children are abused children, and the court should place Sarah back at the Menninger Clinic and allow no communication with appellant. (Tr. Vol. II, at 163-166.) He also testified that Abby and Ashley are at risk for the same behavior, and they also should have no communication with appellant until they are of legal age or until the mental health professionals treating them determine they are emotionally capable of handling the unhealthy relationship without being subject to such extreme abuse. (Tr. Vol. II, at 164; 166.)
 {¶ 35} Thomas Paulucci, J.D., Ph.D., was asked to review the complete records in this case and he spoke to Drs. Canowitz, Beck and Flynn O'Malley, from Menninger. (Tr. Vol. IV, at 17; 36.) Dr. Paulucci found Dr. Canowitz's opinion significant because he was the one who had reviewed the entire medical file and then determined that there were stress-induced issues but no other significant medical disorders. (Tr. Vol. IV, at 37.) Dr. Paulucci found Dr. O'Malley's opinion significant because he had treated Sarah at Menninger, and found both her depression and anxiety improved when she was away from both parents. (Tr. Vol. IV, at 38.)
 {¶ 36} Dr. Paulucci testified that he determined that this case involves a fictitious disorder by proxy on behalf of appellant. (Tr. Vol. IV, at 51.) Fictitious disorder by proxy involves "the deliberate production or feigning of physical or psychological signs or symptoms in another person who is under the individual's care." (Tr. Vol. IV, at 22.) The effect is that the children, or at least Sarah, will reflect the perspective and positions of appellant. (Tr. Vol. IV, at 51.) Dr. Paulucci also testified that Pediatric Condition Falsification ("PCF"), a form of child abuse, exists in this case. (Tr. Vol. IV, at 52-53.) PCF includes inappropriate health-seeking behaviors, exaggeration, fabrication and simulation of symptoms. PCF is produced by the mother and manifested in the child. (Tr. Vol. IV, at 53-54.) Dr. Paulucci also believes that the classical form of Munchausen is present in this case. Munchausen occurs when a parent reports either chronic and persistent physical symptoms for which there can be no physical findings, exaggerates symptoms, or induces illness which can lead to death. (Tr. Vol. IV, at 59; 24.) Dr. Paulucci testified that the repetitive presentation for medical treatment in the absence of any kind of confirmatory or medical data, or the persistent need for the parent to have the child diagnosed as ill is consistent with the classical form of Munchausen, and, therefore, constitutes a form of abuse. (Tr. Vol. IV, at 59.) Dr. Paulucci testified that he believes there is a potential for serial Munchausen in this family, and that the statistics demonstrate that the probabilities that Munchausen will affect the other children in the family unit is 33 to 50 percent. (Tr. Vol. IV, at 62; 56.) Dr. Paulucci also testified that he was concerned with the parental alienation demonstrated and inflicted by appellant. (Tr. Vol. IV, at 62-69.)
 {¶ 37} Finally, Dr. Paulucci testified that he believes appellant's conduct resulted in her children being abused, and that her behavior creates a substantial risk to the health and safety of the children. (Tr. Vol. IV, at 75-76.) Dr. Paulucci recommended that the court should order that the children have no contact with appellant, even though the children are bonded with appellant and want to live with her, as it is not in their best interests. (Tr. Vol. IV, at 76-81.) Dr. Paulucci believes that all three girls are at risk. (Tr. Vol. IV, at 85.)
 {¶ 38} The Director of Special Education for Bexley Schools testified that, during the first semester of the 2001-2002 school year, Ashley was absent 2.5 days while living with appellee and, during the second semester while living with appellant, she was absent 8.5 days. (Tr. Vol. V, at 9; 22-23.) The middle school principal at Bexley testified that appellant had requested that Ashley be tested for learning disabilities, but several teachers and appellee determined that it was unnecessary. (Tr. Vol. IX, at 11-14.) Appellee's Exhibit PPP was a letter dated May 20, 2002, from the principal to appellee indicating that Ashley had missed 19 of the 170 days of school in the 2001-2002 school year. Of those 19 days, only 1.5 occurred in the first semester when Ashley was living with appellee. (Tr. Vol. IX, at 25-28.)
 {¶ 39} There was also testimony suggesting that excessive medical visits were beginning with Ashley. Between December 4, 2001, with a visit to her primary care physician, through February 4, 2002, there were six visits to urgent care or emergency rooms. (Tr. Vol. I, at 73-74.) A pattern was demonstrated of seeing various doctors at various places. (Tr. Vol. I, at 74.) During that time period, she was taking antibiotics for 20 of the days. (Tr. Vol. I, at 75.)
 {¶ 40} The middle school physical education teacher, who was also Abby's advisor at Columbus School for Girls, testified that, during the first three quarters of the 2001-2002 school year, Abby's grades and effort were mostly consistent. (Tr. Vol. VIII, at 128; 136.) However, her progress report for the fourth quarter demonstrated that Abby's attendance had become problematic and her grades were going to reflect that she had missed a lot of instruction and was behind in her assignments. (Appellee's Ex. LLL.) Appellee testified that he had only seen Abby for one week in December, and approximately two days between January and April 2002. (Tr. Vol. VI, at 107-108.)
 {¶ 41} Appellee testified that appellant had interfered with his visitation with the girls. Since her return from Menninger, he had only seen Sarah during the enrollment meeting at Bexley High School in December 2001, and during one visit to Children's Hospital. (Tr. Vol. VI, at 127.) As stated above, appellee saw Abby for one week in December and approximately two days between January and April 2002. (Tr. Vol. VI, at 107-108.) He experienced an abbreviated winter break with Ashley and had seen her approximately five nights since January 1, 2002. (Tr. Vol. VI, at 108.) He testified that, when he telephones the house, appellant tells the children that the child abuser is on the phone. (Tr. Vol. VI, at 131.) He does not pick up the children at school anymore, as school officials asked him not to because often the police were called by either or both parties and a scene occurred. (Tr. Vol. VI, at 107; 109.) Many times appellant would be present at school and the police were called. Appellant has come to his house and called the police to determine whether the children were safe. (Tr. Vol. VI, at 109.) Two private investigators, hired by appellee, testified about appellant's behavior when appellee would attempt to pick up the children for visitation, including that she was always present, she would motion to the girls to come over to her car, call the police or arrive at appellee's house and refuse to leave until the police assured her the children were fine. (Tr. Vol. VIII, at 19-97.) Two Bexley police officers also corroborated appellee's testimony that police officers were often called to the residences or schools. (Tr. Vol. VII, at 222-247.)
 {¶ 42} Appellant presented the testimony of several witnesses. The first was Dr. Steven Beck, who treated the girls for several years until January 10, 2002, when the girls fired him and he had not seen them since then. (Tr. Vol. VI, at 11-12.) He had been chosen by the court during the divorce action. (Tr. Vol. VI, at 54.) Dr. Beck testified that the children are very bonded with appellant but there is a part of the relationship that is unhealthy, including the hypochondriasis, the misinterpretation of physical illnesses, the trips to the doctors, and the over-interpretation of physical ailments. (Tr. Vol. V, at 178.) He stated that Sarah was enmeshed with appellant regarding appellant's issues with appellee. (Tr. Vol. V, at 187.) He stated that enmeshed from a psychological standpoint does not have a positive connotation because the child takes on the parent's issues or concerns to the detriment of the child. (Tr. Vol. VI, at 92.) Dr. Beck believes that Sarah is a hypochondriac. (Tr. Vol. V, at 205. See, also, Tr. Vol. V, at 263.) Dr. Beck is concerned with the mental abuse inflicted by appellant based upon the previous contact he had with appellant and the children, the hypochondriasis he observed, that appellee told him that Sarah was confined to a wheelchair and had not attended school since January, and his conversation to Dr. Canowitz. Based upon these factors, Dr. Beck had reported appellant to Children's Services. (Tr. Vol. V, at 219.) Dr. Beck testified that, "Ms. Schottenstein is the poster woman for parental alienation." (Tr. Vol. VI, at 57.)
 {¶ 43} Dr. Joyanna Lee Silberg also testified as an expert for appellant. Dr. Silberg is a clinical child psychologist and reviewed medical records and other documents involved in this case. (Tr. Vol. IX, at 54; 84-85.) She also evaluated the children, appellee and appellant in early May 2002. (Tr. Vol. IX, at 98.) Dr. Silberg testified that appellant does not always exercise the best judgment, particularly when she is under stress. (Tr. Vol. IX, at 113-114.) Appellant has committed some parental alienation, as has appellee. (Tr. Vol. IX, at 134-136.) She believes that the relationship between the children and parents is not best characterized as one of enmeshment, even though dependency is involved. (Tr. Vol. IX, at 137.) She testified both parents have personality disorders. (Tr. Vol. IX, at 140-144.) Dr. Silberg testified that it would be completely inaccurate to diagnose appellant with Munchausen disorder by proxy or factitious disorder by proxy because the disorders usually involve young children, and Sarah's symptoms fit known medical conditions which she cannot create. (Tr. Vol. IX, at 151-152.) Dr. Silberg testified that she diagnosed Sarah as having a pain disorder associated with both psychological factors and a general medical condition. (Tr. Vol. IX, at 168.) This disorder requires a medical cause for the symptoms and pain but the patient's perception of pain is heightened by the experience of some stressors. (Tr. Vol. IX, at 168.) Dr. Silberg does not believe that mental abuse was inflicted by appellant upon Sarah. (Tr. Vol. IX, at 172-173.)
 {¶ 44} Dr. Silberg believed that Abby was suffering from post-traumatic stress disorder based upon two incidents involving appellee. One incident, according to Dr. Silberg, was that Abby ran away from appellee and hid under a bush on the playground at school, and the second incident involved her being physically removed from school and having a struggle in the car and eventually running away from him at his house and leaving in her mother's car. (Tr. Vol. IX, at 179-180.) Dr. Silberg reported child abuse to Children's Services in May 2002, based on what she believed to be appellee's medical neglect of Sarah as well as the incident which occurred at Abby's school. (Tr. Vol. IX, at 183-185.) Dr. Silberg described appellant as probably hard to get along with because she is very single-minded in her views, impulsive when stressed, angry and irrational. (Tr. Vol. IX, at 267-268.) However, Dr. Silberg found appellant's behavior better than appellee's because appellant's "conduct is to the end of getting her kids medical, educational help, facilitating the goals that they have with their own life, pursuing the hobbies and interests that they have." (Tr. Vol. IX, at 334.) Dr. Silberg described appellee as acting in a detrimental way towards the children because he "appears to have a single-minded goal of using his power to deprive the children of some of the things that they want and that they are seeking, and that because of that, particularly his interference with getting medical care for Sara [sic], for interfering with the children's desire to live with their mother, which is the parent of their choice, that he is in fact, in the course of things behaving in a way that is detrimental to the children." (Tr. Vol. IX, at 334.)
 {¶ 45} Finally, Dr. James P. Reardon testified on rebuttal. Dr. Reardon is a licensed psychologist who reviewed records and trial exhibits, witnessed Dr. Silberg's deposition and examined the children. (Tr. Vol. X, at 31; 38; 49-52.) Dr. Reardon testified that he believes Sarah is experiencing an undifferentiated somatoform psychological disorder or, in the alternative, somatoform pain disorder for psychological reasons; if she has a general medical condition, the complaints and impairment are grossly in excess of what would be expected. (Tr. Vol. X, at 90-93.) Dr. Reardon believes that Sarah's problems are psychologically based, not somatically based. (Tr. Vol. X, at 93.) He believes the parent-child relationship problems are the result of appellant's alienating behavior and her interference with the opportunity of appellee to maintain a healthy relationship with Sarah. (Tr. Vol. X, at 100.) He stated that appellant had committed physical abuse on Sarah by reinforcing the somatoform disorder and excessive utilization of unnecessary medical care. (Tr. Vol. X, at 100-101.) He also found that appellant had neglected Sarah because of her alienating behavior and her failure to appropriately provide parenting and support with respect to the emotional and academic disability. (Tr. Vol. X, at 101.) His opinion was that, "as a result of the behavior of her mother, Sara [sic] Schottenstein has suffered physical and emotional consequences, has developed a psychological condition, specifically undifferentiated somatoform disorder. Has been alienated from her, a relationship with her father, which is not, I think, healthy from a psychological point of view. And I think that her mother's behavior has not only supported and reinforced, but has been the primary impetus for the development of the somatoform disorder, whether it is undifferentiated somatoform disorder or a pain disorder for psychological reasons." (Tr. Vol. X, at 103.) He also stated that, in his opinion, appellant's behavior in interacting with Sarah has been "incredibly pathological, toxic, in terms of creating the circumstances and reinforcing the development of a disabling, psychological emotional condition." (Tr. Vol. X, at 105.) He thought it was as "devastating from an emotional point of view" as any he had seen. (Tr. Vol. X, at 105.)
 {¶ 46} Dr. Reardon recommended that Sarah not have any contact with her mother until Sarah has responded to treatment, that appellant be willing to get treatment, and those doctors who are in charge of Sarah's treatment agree that a healthy relationship can be achieved. (Tr. Vol. X, at 115-116.) He believes that Sarah has suffered a psychological or mental injury and, in all likelihood, suffered some medical harm and medical damage as a result of the actions of appellant. (Tr. Vol. X, at 130.)
 {¶ 47} Dr. Reardon testified that, based upon his examination of Abby, the same process of alienation, resistance and, to a lesser degree than Sarah, a somatoform disorder was beginning. (Tr. Vol. X, at 112.) Abby was extremely conflicted psychologically and emotionally, and extremely alienated from her father. (Tr. Vol. X, at 112.) Ashley also appears to be following the path of Sarah of visiting doctors at an excessive rate. (Tr. Vol. X, at 114.) Dr. Reardon testified that Abby admitted feeling depressed, she was emotional, very teary-eyed and upset during the interview. (Tr. Vol. X, at 163-164.) He diagnosed Abby with an anxiety disorder NOS, child-relational problems, and neglected child based upon appellant's alienating behavior, appellant neglecting to support and encourage Abby emotionally and academically, and encouraging Abby's participation in the legal arena. (Tr. Vol. X, at 176-177.) He believes that Abby is substantially at risk with regard to her emotional well-being. (Tr. Vol. X, at 179.) In his opinion, the risk is beyond substantial, but is a manifestation of the beginning of a serious psychological disorder and an anxiety disorder. (Tr. Vol. X, at 180.)
 {¶ 48} Regarding Ashley, Dr. Reardon testified that she was the least affected of the three children. (Tr. Vol. X, at 142.) There was a parent-child relational problem and neglect by appellant as a result of appellant's attempts to alienate Ashley from appellee, and appellant's failure to address Ashley's academic attendance problems. (Tr. Vol. X, at 144.) His opinion was that appellant's neglect resulted in Ashley suffering mental injury that harms or threatens to harm Ashley's health. (Tr. Vol. X, at 148-149.) He recommended that Ashley and appellant also not have a relationship in the short-term, Ashley receive appropriate psychological services, and that, based upon her response to those services and treatment and the recommendations of the counselor and appellant's willingness to seek appropriate psychological care, the relationship resume in the long-term. (Tr. Vol. X, at 151-154.)
 {¶ 49} During this trial, Sarah was admitted to Cincinnati Children's Hospital in an effort to diagnose her condition. After reading the final report from Cincinnati Children's Hospital, Dr. Reardon testified that the report negated the basis of Dr. Silberg's opinion because her opinion was predicated on the assumption that a serious medical condition which had not yet been diagnosed was causing Sarah's pain; an assumption that was not confirmed by the contents of the hospital report. (Tr. Vol. X, at 160.) The hospital report, dated June 24, 2002, provided that, with the exception of biopsy-proven erythema multiforme, documented oral ulcers, and an isolated elevated erythrocyte sedimentation rate, her entire medical work-up was negative. Although the doctors were waiting for biopsy results obtained during endoscopy and colonoscopy, no abnormalities were noted during the procedures. The doctors concluded that the oral ulcers and erythema multiforme may represent early Behcet's syndrome or autoimmune progesterone dermatitis, but the full manifestations of these diseases had not become evident and would not account for the pain and disability. While at the hospital, Sarah's health improved. She was eating, gained weight, became stronger and was ambulating. The doctors concluded that Sarah met the criteria for somatoform pain disorder and recommended that Sarah be transferred to a rehabilitation facility to continue to receive medical care, physical therapy, supplemental nutrition, psychotherapy and, if possible, holistic health services. (Joint Ex. A.)
 {¶ 50} The trial court found that the evidence presented demonstrated that appellant had permitted absenteeism from school, undermined the girls' relationship with, and alienated them from, appellee, obstructed appellee's regular parenting time, caused the girls to become overly identified with and involved in appellant's problems and concerns, particularly Sarah, who is "enmeshed" with appellant. The trial court found appellee's expert witnesses more persuasive and credible, particularly Dr. Reardon. The trial court also found that appellant interfered with Sarah's psychological treatment at Menninger and that Sarah's medical condition dramatically deteriorated while solely in appellant's care. The trial court found that, by her actions, appellant abused the girls and violated her duty of care, and endangered her children because these actions have harmed and threatened to harm the welfare of Sarah, Ashley and Abby.
 {¶ 51} Given the above testimony, the trial court's conclusion is clearly supported by the evidence. While Dr. Silberg testified that appellant did not inflict mental abuse on Sarah and that Sarah suffered from a pain disorder associated with both psychological factors and a general medical condition, the report from Cincinnati Children's Hospital rebutted her opinion. Dr. Silberg relied largely on the representations of the girls to reach her opinions and many of the facts she relied upon were refuted by other witnesses. Three of appellee's witnesses, Drs. Litvak, Paulucci and Reardon, recommended that the children have no contact with appellant until the mental health professionals determine contact is appropriate again because of the threat to their health and well-being that her behavior presents to the children. Given the conflicting evidence, determinations of credibility and the weight to be given to the evidence are for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Appellant's fifth issue presented by her assignment of error is not well-taken.
 {¶ 52} For the foregoing reasons, appellant's assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed.
Judgment affirmed.
KLATT and WATSON, JJ., concur.
[1] Appellant's appeal of the trial court's denial of her petition for a domestic violence civil protection order was dismissed by this court on March 11, 2003.
[2] The Bexley High School principal testified that Sarah was enrolled on December 14, 2001, which was a Friday, and also on December 17, 2001, which was a Monday. Appellee testified the enrollment occurred on November 14, 2001. (Tr. Vol. VI, at 127.)